**In re KRAFT, LLC, a Limited Liability Company, Debtor.**

**Kraft, LLC, a Limited Liability Company, Plaintiff,**

**v.**

**Charles R. Greiner, Dennis Churilla, Jeffrey D. Greiner, Louis Gerodemos, Mary Louise Sarey, Robert Heikema, Terry R. Schrefler, Brenda L. Van Zuidam, Defendants.**

**Bankruptcy No. 07–21367 JPK.
Adversary No. 08–02038.**

**United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.**

**April 22, 2010.**

---

**41.** *See,* Brief in Support of the Interim Trustee's Motion for Resolution of Dispute at pg. 17.

Lori D. Fisher, Esq., Merrillville, IN, for the Plaintiff, Kraft, LLC.

Kenneth A. Manning, Esq., Dyer, IN, for the Defendants.

## MEMORANDUM OF DECISION

J. PHILIP KLINGEBERGER, Bankruptcy Judge.

This contested matter/adversary proceeding arises from a complaint filed on April 11, 2008, by Kraft, LLC, against Charles R. Greiner, Dennis Churilla, Jeffrey D. Greiner, Louis Gerodemos, Mary Louise Sarey, Robert Heikema, Terry R. Schrefler and Brenda L. Van Zuidam (the "Investors"). On September 7, 1999, Kraft Funeral Services and Crematory, Inc. ("Kraft Funeral") entered into promissory notes with the eight individual Investors, each in the amount of $50,000 (the "Notes"). In order to secure the foregoing Notes, on April 7, 2000, Kraft, LLC executed and gave a mortgage to the Investors on real estate commonly known as 370 N. County Line Road, Hobart, Indiana (the "Property"). Kraft, LLC contends that the mortgage executed on April 7, 2000 is not valid on several theories, including that the mortgage does not adequately describe the secured debt pursuant to I.C. § 32–21–4–1 and therefore should be avoided pursuant to 11 U.S.C. § 544(a)(3).

On December 12, 2008, the court held a pretrial conference at which it was determined that the case should be decided on a stipulated record, which was memorialized by an order entered on January 8, 2009. Following several extensions of time to file the stipulated record, on April 21, 2009, the United States Trustee filed a motion to dismiss, which was eventually resolved. While the motion to dismiss was pending, the parties requested that the deadlines in this case be stayed until after the motion was resolved, a request which the court granted. On June 3, 2009, the court entered an order making the stipulation due on June 8, 2009, the initial briefs due on June 22, 2009, and any replies due on July 22, 2009. The parties adhered to the

deadlines, although only the Investors filed a reply brief.

The record is closed. The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157(a) and (b), and N.D.Ind.L.R. 200.1(a). The case is a core proceeding under 28 U.S.C. § 157(b)(2)(K).

## I. *THE FACTUAL RECORD/ ISSUES PRESENTED*

Pursuant to an order of the court entered on January 8, 2009, this case is submitted by means of a stipulated record. On June 8, 2009, the Plaintiff Debtor and the Defendant Investors jointly filed with the court a document entitled Stipulation of Facts/Exhibits (the "Stipulation"), in which the parties set out not only the legal issues in this case, but also the facts and evidence the court is to consider in rendering a final decision. The Stipulation provides as follows: [1]

> For purposes of convenience and concise record, exhibits 1, 5 and 6 are samples, examples of identical documents for each of the 8 Investors. The dates, amounts and signatures are identical duplicate; only the subscriber name, payee and social security number would be different, appropriately designating the proper Investor. Exhibit 11 is the identical real estate mortgage for each Investor.

### *STIPULATION OF FACTS*

1. Kraft Funeral Services and Crematory Inc. (hereinafter Kraft Funeral) is an Indiana corporation for profit which was incorporated on November 18, 1998. It has elected sub-s status for reporting its income and filing tax returns.

2. In late part of 1998, Dennis Churilla and Charles R. Greiner approached Jackie Kraft about investing in the construction of the new funeral home and crematory. Dennis Churilla and Charles R. Greiner solicited and obtained all of the Investors.

3. On, or about, December 1998 each of the Investors signed and executed a "Subscription Agreement" which was not signed by Kraft Funeral. The subscription agreement was to/in favor of Kraft Funeral. See Exhibit "1".

4. In the spring/early summer 1999, Kraft Funeral and Debtor's principals sought a loan and financing from, and through, National City Bank. These efforts failed.

5. On, or about, June 1, 1999, at the request of Investors, Kraft Funeral and Debtor's presented to Investors a copy of the proposed mortgage in favor of Investors. This request was made as part of the ongoing negotiations to obtain sufficient funds, financing and lender requirements. See Exhibit "2".

6. On, or about, July 8, 1999 Peoples Bank approved a loan and financing to Kraft Funeral and Debtor. A true and complete copy of the Peoples Bank "loan commitment" letter is attached as Exhibit "3".

7. Among other requirements, the Peoples Bank loan commitment required:

a. Subordination of Investor's interest to Peoples Bank,

---

**1.** In the stipulation the parties defined the Debtor as Kraft, LLC, an Indiana limited liability company; Kraft Funeral as Kraft Fu- neral Services and Crematory, Inc.; and the Investors as all of the named defendants collectively.

b. Peoples Bank would have to review and approve "all documents" evidencing Investor indebtedness,

c. No less than $340,000 "equity cushion" had to be deposited in escrow with Peoples Bank, and applied towards construction prior to any bank disbursement,

d. Any mortgage in favor of Investors had to be junior, and subordinate to Peoples Bank.

8. At the end of July, 1999, Investors received "Projected Statement of Operations" from Russell Kraft, Sr.; this "Projected Statement" was prepared by Kraft's accountant, John Lowenstein. See Exhibit "4".

9. The total cost for the purchase of the real estate and the new funeral home building, improvements and equipment was estimated and projected to be $1.2 million.

10. On September 7, 1999, each of the Investors signed and executed a "Subscription Agreement" which was signed by Kraft Funeral. The subscription was to/in favor of Kraft Funeral. See Exhibit "5".

11. On September 7, 1999, a Promissory Note was entered into by Kraft Funeral and each of the Defendants for $50,000.00 per individual. See Exhibit "6".

12. On, or about September 7, 1999, each of the Investors paid to Kraft Funeral $50,000; a total of $400,000.00 was paid to Kraft Funeral. The funds received from Investors were partially used in the construction of the funeral home building.

13. On September 8, 1999, a Trustee's Deed was executed transferring real estate located at 370 N. County Line Road, Hobart, Indiana (hereinafter the "Real Estate") to Kraft Funeral which deed was recorded October 6, 1999. See Exhibit "7".

14. On November 18, 1999, Kraft LLC was incorporated.

15. On December 23, 1999, an Inter Creditor Agreement was signed/executed by Investors and Kraft, LLC (Debtor), at the request of Peoples Bank. See Exhibit "8".

16. On January 4, 2000, Kraft Funeral executed a Quit Claim Deed transferring title to the Real Estate to Kraft LLC which deed was recorded January 7, 2000. See Exhibit "9".

17. The new funeral home was built and constructed by Project Resource & Development LLC, and was completed on, or about March 15, 2000.

18. On April 7, 2000, Kraft LLC executed a mortgage on the Real Estate in favor of Peoples Bank to secure a Note in the amount of $800,000.00 which is attached hereto as Exhibit "10".

19. On April 7, 2000, Kraft LLC executed a mortgage in favor of "Lender" in the amount of $400,000.00 a copy of said mortgage is attached hereto as Exhibit "11".

20. Since spring of 2000, Debtor has leased the County Line Rd. real estate to Kraft Funeral. There are no other tenants/occupants of the real estate.

21. At the commencement of the case, the shareholders of Kraft Funeral and the members/equity owners of Debtor are identical. Russell A. Kraft, Sr., Jacqueline Kraft, Russell A. Kraft, Jr. and Tammy Kraft each "own" 25%.

22. The Debtor's Schedule F reflects unsecured creditors in the amount of Schedule F, $258,192. (Court docket 52) in addition to the Debtor is amended Schedule F to list an omitted creditor, John Lowenstein. Attached hereto as Exhibit "12" is Debtor's proposed amended Schedule F.

23. The addresses listed and shown on Exhibit A (attachment to real estate mortgage, Exhibit "11") are, and were the accurate addresses of each lender throughout all relevant times.

24. All Investor Subscription Agreements, notes and real estate mortgages were prepared by Attorney William Longer pursuant to the request of the Investors that Debtor have same prepared. Attorney Longer was attorney for Kraft Funeral and Debtor. Investors did not have an attorney but were advised by the Debtor to have all documents reviewed.

## STIPULATION OF EXHIBITS

The following documents, papers and exhibits are stipulated as true, accurate and complete documents and records for purposes of authenticity and admissibility:

1. Unsigned Subscription Agreement (Charles Greiner). (Note: An identical document is present for each of the other 7 Investors).

2. Unsigned Second Real Estate Mortgage.

3. Peoples Bank loan commitment letter dated July 8, 1999.

4. Projected Statement of Operations.

5. Subscription Agreement (Charles Greiner). (Note: An identical document is present for each of the other 7 Investors).

6. Promissory Note dated 9–7–1999, $50,000.00. (Note: the identical Notes are exhibits to proofs of claim filed by Investors; claims # 4 thru 11 inclusive).

7. Trustee's Deed from Peoples Bank SB Trustee to Kraft Funeral dated September 3, 1999 and recorded October 6, 1999.

8. Inter Creditor Agreement.

9. Quit–Claim Deed from Kraft Funeral to Kraft LLC dated January 4, 2000 and recorded January 7, 2000.

10. Peoples Bank real estate mortgage, document # 2000–024534. Note: the identical exhibit to proof of claim# 2; Peoples Bank Note/Security Agreement dated April 7, 2000. Note: identical exhibit to proof of claim # 2; and, Peoples Bank Note/Security Agreement dated April 7, 2000. Note: identical exhibit to proof of claim # 2.

11. Real Estate Mortgage, document # 2000–024534. (Note: the identical document is an exhibit to proofs of claim filed by Investors; claims # 4 thru 11 inclusive).

12. Proposed Amended Schedule F of Debtor.

## JUDICIAL NOTICE

The parties additionally request the Court to take judicial notice, and accept as additional documentary evidence, the following parts of the Court's own record and file:

1. Disclosure Statement (docket 54).

2. Chapter 11 Plan (docket 53).

3. Amended Disclosure Statement (docket 100).

4. Amended Chapter 11 Plan (docket 108).

*LEGAL ISSUES*

1. Does Debtor have standing to pursue avoidance of Investor's secured claim and mortgage pursuant to 11 U.S.C. 544(a)(3)?

2. Can Debtor, as "trustee", recover the property transferred (i.e. Investor's mortgage) for the benefit of this estate? Is there a benefit to this estate and its creditors?

3. Was there valid and/or sufficient consideration for Investor's mortgage?

4. Does Investor's recorded mortgage sufficiently describe and identify the indebtedness that it was intended to secure?

5. Under Indiana Law, would a subsequent bona fide purchaser for value take priority position over Investor's secured claim and mortgage?

The foregoing controls the disposition of this adversary proceeding, both as to the facts and as to the issues to be determined.

## II. *LEGAL ANALYSIS*

### A. *The Description of the Indebtedness in the Mortgage*

Kraft LLC argues that pursuant to 11 U.S.C. § 544(a)(3), it can avoid the Investor's mortgage lien on the property located at 370 N. County Line Road, Hobart, IN 46342. 11 U.S.C. § 544(a)(3) provides as follows:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

. . .

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

In *In re Canaday,* 376 B.R. 260, 265–68 (Bankr.N.D.Ind.2007) (citing its decision in the case of *In re Stubbs,* 330 B.R. 717, 723–25), this court stated the basic framework for performing an analysis under 11 U.S.C. § 544(a)(3) as follows:

In the case of *In re Baldin,* 135 B.R. 586 (Bankr.N.D.Ind.1991), the Honorable Kent Lindquist . . . stated:

The Seventh Circuit has held that *actual* notice by the prepetition debtor of the encumbrance or defect, as opposed to *constructive* notice, is irrelevant when § 544(a) is invoked by a trustee or debtor-in-possession with the status of a hypothetical creditor, or bona fide purchaser. In *In re Sandy Ridge Oil Co., Inc.,* 807 F.2d 1332 supra, the Court stated as follows:

The rights enforced in bankruptcy are rights created by state law. *Matter of Kaiser,* 791 F.2d 73, 74 (7th Cir.1986). Accordingly, the courts generally look to state law to determine whether property is an asset of a debtor. *In re Brass Kettle Restaurant, Inc.,* 790 F.2d 574, 575 (7th Cir.1986); *see also, In re K & L Limited,* 741 F.2d 1023, 1030 n. 7 (7th Cir.1984); *Matter of Gladstone Glen,* 628 F.2d 1015, 1018 (7th Cir.1980). Here, however, Congress has required that we do otherwise.

Section 544(a) states that a trustee "shall" be able to avoid an encumbrance that would be voidable by a bona fide purchaser "without regard

to any knowledge of the trustee or of any creditor." The natural interpretation of this language is that actual knowledge of the encumbrance will never prohibit a trustee from invoking § 544(a)(3).

The Third Circuit's analysis of the legislative history of § 544(a) in *McCannon v. Marston,* 679 F.2d 13 (3d Cir.1982), supports the view that Congress meant what it said. In *McCannon,* the issue before the court was whether the "actual knowledge" clause in § 544(a) gave a trustee the powers of a bona fide purchaser, regardless of the trustee's actual knowledge and regardless of any constructive notice that otherwise would be imputed to a subsequent purchaser. The *McCannon* court noted that the legislative history of § 544(a) itself was sparse, and therefore turned its attention to a 1973 draft bankruptcy code that contained a similar provision.

*Baldin,* 135 B.R. at 592.

The *Baldin* court continued by analyzing Indiana cases on the subject:

> In *Sandy Ridge,* the Debtor–in–Possession filed in Adversary Proceeding asserting that a certain mortgage, though otherwise valid, was recorded in contravention of the Indiana Statute requiring the name of the person who prepared the document to be indicated on the document. The Debtor asserted that because the mortgage was improperly recorded it was voidable as to a bona fide purchaser. *See,* I.C. 36–2–11–15(b). The Bankruptcy Court, and the District Court, based their decisions on the only reported decision involving this statute, *United States v. Lake County Farm Bureau Co-op.,* 205 F.Supp. 808 (N.D.Ind. 1962), which concerned a chattel mort-

gage on crops. In that case, the Court held that the filing of the mortgage in violation of the statute was a nullity and therefore the mortgage, although recorded, gave no constructive notice to the Defendant's creditors. The Seventh Circuit concluded that there was no controlling Indiana precedent on the issue, and certified the issue to the Supreme Court of Indiana. The issue upon certification to the Supreme Court of Indiana was decided in the case of *In re Sandy Ridge Oil Co., Inc.,* 510 N.E.2d 667 (Ind.1987), discussed infra.

The courts in this district in keeping with *Sandy Ridge* have rather consistently held that actual knowledge is not imputable to the debtor-in-possession due to his status as a bona fide purchaser pursuant to § 544(a)(3). *See e.g., In re Arnol & Mildred Shafer Farms,* 102 B.R. 712, 716 (Bankr. N.D.Ind.1989), rev'd. on other grounds, 107 B.R. 605, 608; *In re Herr,* 79 B.R. at 796–98, supra.

It is thus clear that the fact that the prepetition Debtors herein had actual knowledge of the Defendant's mortgage, and the recording thereof is irrelevant, and such knowledge cannot be imputed to them in their status as post petition debtors-in-possession.

It has always been the law of Indiana that even if a mortgage is improperly recorded, or has not been recorded, it is valid between the parties. *In re Dunn,* 109 B.R. 865, 873 (Bankr. N.D.Ind.1988).

However, because the express language of § 544(a)(3) grants the trustee (or the debtor-in-possession) the rights of a bona fide purchaser of real property, even where such purchaser does not actually exist, any transfer of real property not properly perfected

as to a bona fide purchaser as of the petition date is of no effect against the debtor-in-possession.

The definition of a "bona fide purchaser", and thus the requirements for perfection against such an entity, are governed by state law. *In re Sandy Ridge Oil Co., Inc.*, 807 F.2d at 1336, *supra; In re Great Plains [Western] Ranch Co., Inc.*, 38 B.R. 899, 905 (Bankr.C.D.Cal.1984). The Court in *Great Plains* provided the background to § 544(a)(3) noting that it was added to the Bankruptcy Code in 1978 to extend the "strong-arm" voidance powers to a bona fide purchaser of real estate in addition to the voiding powers of a judicial lienholder as found in § 544(a)(2) and (a)(3). Providing a clause as to real estate transactions separate from personal property was necessary due to differences found in many state laws. The perfection of a security interest in personal property is generally dealt with pursuant to the applicable provisions of the state Uniform Commercial Code, and builds its priority scheme on the rights of creditors, while the law of real property is built around the recording acts which frequently do not speak of the rights of creditors, but of bona fide purchasers. *Id.* 38 B.R. at 905.

*Id.* at 593–94.

. . .

Indiana Code 32–21–4–1 [formerly 31–2–2–16], provides that constructive notice sufficient to defeat the interests of a bona fide purchaser is given only if certain instruments are recorded. This statute states:

(1). (a) A:

(1) conveyance or mortgage of land or of any interest in land; and

(2) lease for more than three (3) years;

must be recorded in the recorder's office of the county where the land is situated.

(b) A conveyance, mortgage, or lease takes priority according to the time of its filing. The conveyance, mortgage, or lease is fraudulent and void as against any subsequent purchaser, lessee, or mortgagee in good faith and for a valuable consideration if the purchaser's, lessee's, or mortgagee's deed, mortgage, or lease is first recorded.

■■■ Therefore, § 544(a)(3) allows a bankruptcy trustee to avoid an encumbrance on real property when that encumbrance would be voidable by a bonafide purchaser; *In re Camp*, 2007 WL 2257653, at *4 (N.D.Ind.2007) [*citing, In re Sandy Ridge Oil, Co.*, 807 F.2d 1332, 1333 (7th Cir.1986)]; *see also, In re Sagamore Park Properties*, 1995 WL 1049898, at *2 (Bankr.N.D.Ind.1995) [Through the operation of [§ 544(a)(3)], the debtor holds, as a matter of federal law, all the rights of a bonafide purchaser]. In Indiana, a bonafide purchaser is one who buys in good faith, for value, and without notice of prior interests in the property; *United States of America v. Arnol & Mildred Shafer Farms, Inc.*, 107 B.R. 605, 607–08 (N.D.Ind.1989) [*citing, In re Herr*, 79 B.R. 793, 798 (Bankr.N.D.Ind.1987); Indiana Law Encyclopedia, *Sales of Realty*, § 102 at 341]. The express language of § 544(a) provides that the actual notice of the debtor-in-possession is irrelevant.

■■■ Thus, a creditor who seeks to counter the debtor-in-possession's efforts to avoid a mortgage lien must show that a subsequent "purchaser" would have had notice of the lien, as determined by applicable state law; *In re Canaday*, 376 B.R. 260, 272 (Bankr.N.D.Ind.2007). Under

Indiana law, a mortgage gives constructive notice of its existence to subsequent purchasers if it is properly acknowledged and recorded—*C. Callahan Co. v. Lafayette Consumers Co.*, 102 Ind.App. 319, 2 N.E.2d 994, 1000 (1936)—and if other legal requirements have been satisfied. Constructive notice may be implied where a proper examination of the record would have led a reasonable man to conclude that the property to be mortgaged was subject to a prior encumbrance; *Arnol & Mildred Shafer Farms, Inc.*, at 608 [*citing,* 20 Indiana Law Encyclopedia, *Mortgages § 108* at 96–97, citing, *inter alia, Mishawaka–St. Joseph Loan & Trust Co. v. Neu,* 209 Ind. 433, 196 N.E. 85 (1935)].

 Certain requirements apply to mortgages in order to render them recordable, and to thus be valid against bonafide purchasers. As stated in *In re Camp,* 2007 WL 2257653, at *4–5 (N.D.Ind.2007):

A mortgage requires some type of description of the debt. A mortgage also must be properly acknowledged and recorded to provide constructive notice to subsequent purchasers. *See Bank of New York v. Nally,* 820 N.E.2d 644, 648 (Ind.2005). Furthermore, the mortgage must be recorded in the proper county and must contain an accurate legal description of the property. *See id.* at 649–50. Lastly, the mortgage must be in the chain of title. *See id.* at 650.

Such requirements must be followed because:

[t]he purpose of the Indiana recording statutes ... is to put all the world on notice of prior liens and encumbrances thereby providing stability to commercial transactions involving the transfers and encumbrances of realty. Strict compliance with [these] statutes permit[ ] innocent third parties to rely on the authenticity and validity of documents in that they were properly

executed, acknowledged, and recorded.

*In re Baldin,* 135 B.R. at 601. Pursuant to this policy, Indiana has maintained a long-standing principle that "the recording of a document not entitled to be recorded does not afford constructive notice." *In re Sandy Ridge Oil Co., Inc.,* 510 N.E.2d 667, 669 (Ind.1987) (collecting cases). Following this rule, courts have held, for example, that recording a mortgage with a defective acknowledgment does not provide constructive notice. *See in re Baldin,* 135 B.R. at 602; *in re Stubbs,* 330 B.R. 717, 731 (Bankr.N.D.Ind.2005), *aff'd,* No. 2:05–CV–439, 2006 WL 2361814, at *5 (N.D.Ind.2006).

But as with most rules, there are recognized exceptions. For instance, a mortgage that omits the preparer's name, thus violating Indiana Code 36–2–11–15(b), still affords constructive notice to a bona fide purchaser. *See In re Sandy Ridge Oil Co., Inc.,* 510 N.E.2d at 671. This is because the defect "was not one which would have been fatal to a conveyance or encumbrance. Thus, a title searcher wishing to verify the legal title of the property would have found all the formalities necessary to provide a valid conveyance or [encumbrance]." *Id.* at 670. Therefore, even though a mortgage omitting the preparer's name violates Indiana statutory requirements, the mortgage still provides constructive notice.

In this case the statute at issue is I.C. § 32–29–1–5, which provides certain requirements for a valid mortgage as follows:

A mortgage of land that is:

(1) worded *in substance* as "A.B. mortgages and warrants to C.D." (here describe the premises) "to secure the re-

payment of" (here recite the sum for which the mortgage is granted, or the notes or other evidences of debt, or a description of the debt sought to be secured, and the date of the repayment); and

(2) dated and signed, sealed, and acknowledged by the grantor;

is a good and sufficient mortgage to the grantee and the grantee's heirs, assigns, executors, and administrators, with warranty from the grantor (as defined in IC 32–17–1–1) and the grantor's legal representatives of perfect title in the grantor and against all previous encumbrances. However, if in the mortgage form the words "and warrant" are omitted, the mortgage is good but without warranty. (emphasis supplied).

■■■ The foregoing provision defines the elements of a mortgage which is valid between the mortgagor and the mortgagee, and—in conjunction with I.C. § 32–21–4–1 [2]—also defines the requirements for a mortgage valid against a bona fide purchaser of the subject property from the mortgagor; *See, In re Canaday*, 376 B.R. 260, 268 (Bankr.N.D.Ind.2007). Under this provision:

[T]he mortgage must be "worded in substance as 'A.B. mortgages and warrants to C.D.'" ... The statute then continues with the requirement that the mortgage provide some definition of the indebtedness which it secures. The necessary elements of the description, according to the statute, are the following:

(1) "the sum for which the mortgage is granted"; or

(2) "the notes or other evidences of debt"; or

(3) "a description of the debt sought to be secured"—and

(4) "the date of the repayment".

Thus, if a mortgage satisfies the requirements of subparagraphs 1, or 2, or 3 above, and recites the date of the repayment, then it is valid.

*Canaday*, 376 B.R. at 269.

In this case, the mortgage at issue was executed by Kraft, LLC on April 7, 2000, in favor of the Investors (defined by the mortgage as "Lender") in the amount of $400,000.00. The mortgage provides in pertinent part as follows:

This Real Estate Mortgage ("Mortgage") is given on the 7 day of April, 2000, by KRAFT, LLC, to secure the debt of KRAFT FUNERAL SERVICES AND CREMATORY, INC. ("Borrower"), whose address is 370 N. County Line Road, Hobart, Indiana 46342, to [see Exhibit "A" attached for name and address of each Lender] ("Lender"). Borrower owes Lender the aggregate principal sum of Four Hundred Thousand Dollars ($400,000.00). This debt is evidenced by Borrower's Notes identified in Exhibit "A" ("Note"), which provide for payment in full *on or before the tenth anniversary of said notes.* This mortgage secures to Lender: (a) the repayment of the Note, with interest, and all renewals, extensions, and modifications of the Note; (b) the payment of any other sums advanced under this Mortgage, with interest; (c) the performance of Borrower's cove-

---

**2.** This statute is the primary Indiana recording provision which accords priority to a conveyance, mortgage or lease properly recorded over subsequent interests acquired in a property. Two amendments to I.C. 32–21–4–1, enacted in 2007 and 2008 respectively in response to the court's decision in *In re Stubbs*, 330 B.R. 717, largely eviscerated statutory requirements/protections designed to provide relative certainty on the face of the mortgage record index as to the valid execution of a mortgage, but these amendments did not affect I.C. 32–29–1–5.

nants and agreements under this Mortgage and the Note. For these purposes, Borrower mortgages and warrants to Lender, and to Lenders successors and assigns, the following described real estate ("Real Estate") located in LAKE COUNTY, INDIANA:

> Lot 1 in unit 6 of Arbor Lane Addition, a Planned unit Development in the City of Hobart, as per plat thereof, recorded in Plat Book 85 page 86, in the Office of the Recorder of Lake County, Indiana.

\* \* \*

Exhibit A, specifically referenced in the mortgage, and attached to and recorded as a part of the mortgage, provides:

### EXHIBIT A

| | Lender name | Address | Amount |
|---|---|---|---|
| 1. | Charles R. Greiner | 2842 45th St., Highland, IN 46322 | $50,000.00 |
| 2. | Dennis Churilla | PO Box 46, Griffith IN 46319 | $50,000.00 |
| 3. | Jeffrey D. Greiner | 8932 Arbor Hill Dr. Highland, IN | $50,000.00 |
| 4. | Louis Gerodemos | 2682 Tower Court, Dyer IN | $50,000.00 |
| 5. | Mary Louise Sarkey | 9229 92nd Pl., St. John, IN 46373 | $50,000.00 |
| 6. | Robert Heikma | 1678 Magnolia Dr., Hobart, IN 46342 | $50,000.00 |
| 7. | Terry R. Schrefler | 2930 Lincoln St., Highland, IN 46322 | $50,000.00 |
| 8. | Brenda L. Van Zuidam | 26W066 Hazel LN., Wheaton, IL 60187 | $50,000.00 [3] |

(Emphasis supplied).

As noted—no pun intended, of course— Exhibit A is attached to the mortgage itself and is a list of eight individuals which includes an address for each individual and a dollar amount listed beside each person. As acknowledged by the litigants, this is the amount each individual loaned to Kraft Funeral pursuant to the eight separate promissory notes executed on September 7, 1999.[4] Each note was in the amount of $50,0000.00, the total sum of which is $400,000.00.[5] The note(s) provide in pertinent part:

On or Before the 7th day of September, 2009, for value received, the undersigned (jointly and severally if more than one signature) promise to pay to the order of Charles R. Greiner the sum of Fifty Thousand Dollars ($50,000.00) payable at 2842 45 St. Suite C Highland, IN or at such other address as holder shall direct in writing, with interest thereon a the rate of five percent (5%) per annum after maturity until paid, with attorney's fees and costs of collection, and without relief from valuation and appraisement laws[.] Interest shall be paid annually.[6]

which is the subject of this litigation, to the Investors.

**3.** See, Exhibit # 11 attached to the Stipulation.

**4.** As the Stipulation sets out, the notes were executed seven months *prior* to the mortgage. On September 7, 1999, the notes were entered into by Kraft Funeral Services and Crematory, Inc. in the amount of $50,000.00 each. Subsequently, by means of a Trustee's deed executed on September 8, 1999, the Property was acquired by Kraft Funeral Services and Crematory, Inc. On January 4, 2000, the Property was conveyed by quit claim deed to Kraft LLC. Finally on April 7, 2000, Kraft LLC executed the mortgage,

**5.** See, Stipulation (preamble), "For purposes of convenience and concise record [*sic*], exhibits 1, 5 and 6 are samples, examples of identical documents for each of the 8 investors." Also see, Stipulation at ¶s.11 & 12.

**6.** The name "Charles R. Reiner", the dates, amounts and the address in Highland, IN were hand written into the note. See, Exhibit # 6 attached to the Stipulation.

\* \* \*

This note, and any extensions or renewals hereof, is secured by a Security Agreement/Real Estate Mortgage on real estate in Lake County, Indiana, commonly known as 370 N. County Line Road, Hobart, Indian, dated the 8th day of September, 1999 and executed in favor of and delivered to the named payee(s) by the maker hereof.[7]

This note is one of multiple notes for an aggregate amount of $400,000.00 so secured, which notes are equally secured without any preference or priority by reason of priority in time of execution, negotiation, maturity, or otherwise.

The Debtor argues that the mortgage given to the Investors does not adequately describe the indebtedness it secures. In support of this contention, Kraft, LLC points out that the mortgage and the exhibit attached thereto do not recite the date when the notes were executed, the maturity date, or the interest rate to be paid on the debt. As a result, it is argued that there is a risk that the Investors' debt could be fraudulently substituted with another indebtedness. The Debtor focuses on the fact that the mortgage does not state the date when the Notes mature, and argues that the mortgage violates I.C. § 32–29–1–5. The Debtor points out that the only maturity date to which the mortgage refers is "payment in full on or before the tenth anniversary of said notes", and that neither the mortgage nor the exhibit attached to the mortgage gives any reference as to when the notes were executed by the parties. As a result, Kraft, LLC takes the position that the mortgage was, "not entitled to recordation pursuant to I.C. 32–21–4–1 which would provide constructive notice to a *bona fide* purchaser. Because there would be no constructive notice of the Mortgage, the Plaintiff/Debtor as a *bona fide* purchaser under 11 U.S.C. § 544 can void the mortgage for the benefit of the estate."[8]

 In determining the sufficiency of the description of a debt in a mortgage, Indiana courts have held that the description in the mortgage of the indebtedness secured need not be literally accurate, but "must be correct so far as it goes, and full enough to direct attention to the sources of correct information in regard to it, and be such as not to mislead or deceive, as to the nature or amount of it, by the language used."; *In re Canaday*, 376 B.R. at 273, *citing, Liberty Mortgage Corp., Inc. v. National City Bank*, 755 N.E.2d 639, 643 (Ind.App.2001) ["the description of the debt in the mortgage was reasonably certain and sufficient to direct attention to the source of correct information."]; *Pioneer Lumber & Supply Co. v. First Merchants National Bank of Michigan City*, 169 Ind. App. 406, 349 N.E.2d 219, 222 (1976) [*citing, Bowen v. Ratcliff* (1895), 140 Ind. 393, 397, 39 N.E. 860, 862]. The purpose of requiring a reasonably certain description of the debt is to preclude the parties from substituting other debts than those described, thereby making the mortgage a mere cover for the perpetration of fraud upon creditors; *In re Canaday*, 376 B.R. at 272; *Pioneer Lumber & Supply Co.*, 349 N.E.2d at 222 [*citing, New v. Sailors* (1888), 114 Ind. 407, 410, 16 N.E. 609, 610].

It is instructive to reprise the facts in *Canaday* in relation to this case. In *Canaday*, the Chapter 13 debtor, Steve Canaday, was mounting the same type of challenge that Kraft, LLC raises in this case:

---

7. The county, state and the date of execution were handwritten on the note. *See,* Exhibit # 6 attached to the Stipulation.

8. Memorandum in Support of Plaintiff's Complaint to Void Lien of Defendants at pgs. 7–8.

whether the description of the debt in the mortgage was sufficient so as to be effective against a hypothetical bonafide purchaser pursuant to a challenge made under 11 U.S.C. § 544. The underlying debt was evidenced by a promissory note dated January 13, 2005, between the debtor and the Donald G. Wilson Revocable Living Trust. However, the mortgage was given by the debtor to Donald Wilson, individually, an entity to whom the obligor was not indebted. The mortgage described the debt as a "Promissory Note dated January 12, 2005 with interest at the rate of 18 per cent per annum computed per terms of Note." There was no such note. The evidence of the indebtedness was in fact dated January 13, 2005; the obligee on the note was The Donald G. Wilson Revocable Living Trust U/A/Dated June 26, 2002. The mortgage did not state the amount of the debt. The court determined that the description of the debt was inadequate and failed to direct a potential purchaser's attention to a source of correct information, and thus under Indiana law the mortgage was not valid against a *bona fide* purchaser:

> In the instant case, although it might be inferred that Donald Wilson is an accurate source of information as to the indebtedness owed to The Donald G. Wilson Revocable Living Trust, there is nothing in this record that establishes that fact. Donald G. Wilson as an individual, and The Donald G. Wilson Revocable Living Trust, are two clearly separate entities, and as far as this record shows, The Donald G. Wilson Revocable Living Trust may be managed by someone other than Donald G. Wilson. Thus, the designation of the mortgagee in the subject instrument as "Donald G. Wilson" does not provide a party viewing the recorded record with a direction of attention to the source of correct information as to the nature of the obligation

secured by the subject mortgage. Indiana case law, in addition to I.C. 32–29–1–5, requires *far more* than the mortgage instrument at issue in this case provides in order to sustain the validity of that mortgage against a *bona fide* purchaser. The mortgage instrument in this case does not direct an individual reviewing the real property records with respect to the subject real estate to an individual who can be assumed, based upon this record, to have knowledge as to the indebtedness secured by the mortgage. The mortgage instrument in this case describes a promissory note which does not exist— there is simply no evidence of any obligation evidenced by a promissory note dated January 12, 2005, and the misdescription of the date of the actual note evidencing the underlying obligation secured by the mortgage creates *exactly* the situation which Indiana case law seeks to avoid with respect to substitution of indebtedness. [Footnote omitted] In similar manner, even apart from the erroneous designation of the date of the promissory note, there is insufficient information in the mortgage to clearly identify the indebtedness to which is relates. Finally, there is no statement in the mortgage of "the date of the repayment" of the indebtedness which the mortgage purports to secure.

Based upon the foregoing, the Court determines that the description of the indebtedness in the mortgage instrument asserted by the claimant to give rise to a secured claim in this case is insufficient under applicable Indiana law to sustain the validity of the mortgage against a *bona fide* purchaser in light of the requirements of I.C. 32–29–1–5.

*In re Canaday,* 376 B.R. at 273.

*Canaday* is an example of a circumstance in which there was nothing as to

the description of the debt in the mortgage except a stated rate of interest and a stated date of execution of the note, which itself was incorrect Additionally, the mortgage did not state the date the debt matured or the dollar amount of the indebtedness. Further, the mortgage did not provide a source of correct information on which a *bona fide* purchaser could rely in order to obtain further information concerning the nature of the obligation—the mortgagee was not the promisee on the underlying obligation. All of the foregoing factors, working in concert, caused this court to rule in favor of the debtor and ultimately allow avoidance of the mortgage.

■ In contrast, many cases are a much closer call, and in determining them courts in Indiana have not focused on one factor alone. Instead, most Indiana cases have examined the description of the debt as a whole to decide whether it puts a potential purchaser on in essence *inquiry* notice of an encumbrance, and whether it is specific enough to prevent the substitution of another debt. This court In *Canaday* examined several of these decisions, stating:

> Indiana has a long line of cases which cogently define the elements of the description of an indebtedness in a mortgage which cause that mortgage to be valid both between the parties, and with respect to third persons, i.e., a *bona fide* purchaser.
>
> In *Ogborn, et al. v. Eliason*, 77 Ind. 393, (1881), the following is stated:
>
> The appellants first insist that the court erred in admitting the mortgage, mentioned in the second paragraph of the complaint, in evidence, because it described no debt. The mortgage reads, "to secure the following described note, to wit," and then follows **a literal copy of the note** alleged to be secured by the

mortgage, except the signatures of the makers. This was a sufficient description. The law does not require a literal description; a general one is sufficient. Jones on Mortgages, sec. 70, says: "Literal exactness in describing the indebtedness is not required; it is sufficient if the description be correct so far as it goes, and full enough to direct attention to the sources of correct and full information in regard to it, and the language used is not liable to deceive or mislead as to the nature or amount of it."

**The mortgage purports to describe a note, and the description given states the amount, the date, the time of payment, the rate of interest and the name of the payee.** The name of the maker or makers, it is true, is not given, but this was unnecessary, as the law does not require a full and complete description. **One that puts those who are interested upon inquiry is sufficient.** It will not do to assume that the description is a literal copy of the paper secured by the mortgage, and, because no signature appears to the description, that there is none to the note secured. The mortgage purports to secure a note, and as there can not be a note unless there is a maker, that fact, if necessary, sufficiently appears. It is, of course, unnecessary to state the name of the maker or makers of a note, if it otherwise sufficiently appears that a debt is secured. If it appeared that the note was not signed, or was signed by a person not bound thereby, a very different question would arise. We think the court did not err in this ruling. (emphasis supplied)

In *Gregory, et al. v. Van Voorst, Auditor*, 85 Ind. 108 (1882), the following was stated:

The mortgage under consideration contained the following statement:

"We, Margaret Gregory and Robert Gregory, mortgage to the State of Indiana the following tract of land," etc., "for the payment of $335, with interest at the rate of eight per cent. per annum, payable in advance," etc.

Here, no covenant to pay the debt is expressed in the mortgage, but there is a sufficient description and identification of the debt to warrant the foreclosure of the mortgage, although there can be no personal judgment.

**If the mortgage had merely stated that it was given to secure a certain note, without any statement of the debt, except the reference to the note, a different question would have arisen; but here the mortgage ascertained the indebtedness.** (emphasis supplied) The foregoing rules were expanded in *Bowen, et al. v. Ratcliff,* 140 Ind. 393, 39 N.E. 860, 861–862 (1895), in which the Indiana Supreme Court expressed the underlying policy for the requirement of a sufficient description of the indebtedness in a mortgage as follows:

> The objection urged to this answer of appellants is that there is no sufficient description of the debt secured by the mortgage. A mortgage, to be effective, must in some way describe and identify the indebtedness it is intended to secure. *Philbrooks v. McEwen,* 29 Ind. 347; *Brick v. Scott,* 47 Ind. 299. Literal accuracy in describing the debt secured by the mortgage is not required, but the description of the debt must be correct, so far as it goes, and full enough to direct attention to the sources of correct information in regard to it, and be such as not to mislead or deceive, as to the nature or amount of it, by the language used. *New v. Sailors,* 114 Ind. 407, 410, 16 N.E. 609; *Ogborn v. Eliason,* 77 Ind. 393, 395; *Insurance Co. v. Finch,* 84

Ind. 305, 1 Jones, Mortg. §§ 70, 343. In *New v. Sailors, supra,* this court said: "It is essential that the character of the debt and the extent of the incumbrance should be defined with such reasonable certainty as to preclude the parties from substituting other debts than those described, thereby making the mortgage a mere cover for the perpetration of fraud upon creditors. *Pettibone v. Griswold,* 4 Conn. 158."

The theme that the requirement of a sufficient description of indebtedness in a mortgage is in part to preclude substitution of another indebtedness for that actually secured by the mortgage was continued in *The Commercial Bank v. Rockovits, et al.,* Ind.App. 499 N.E.2d 765 (1987). It is instructive to note in the following quotation that a critical factor in the Court's determination that the mortgage in that case satisfied sufficiency requirements was that it "directed attention to [the actual mortgagee] as a source of correct information regarding the debt owed to it by the [mortgagors]", stated as follows:

> The statute does not require that the mortgage refer specifically to the amount of indebtedness or the notes which evidence the debt. It only requires the debt to be described. Furthermore, literal accuracy in describing the debt is not required. "[T]he description must be correct, as far as it goes, and full enough to direct attention to the sources of the correct information in regard to it, and be such as not to mislead or deceive, as to the nature or amount of it by the language used." *Bowen v. Ratcliff,* 140 Ind. 393, 39 N.E. 860, 861–862 (1895).

The mortgage in this case directed attention to Commercial as the source

of correct information regarding the debt owed to it by the Rockovits. Calumet does not argue that it was in any way misled or deceived as to the nature of the debt or its amount.[FN3] It simply argues that the lack of a maximum amount in an open-end provision will cause a mortgage to fail. It overlooks, however, the case of *In re Woodruff* where an open-end provision that did not contain a dollar limitation was held to create a valid security interest for the purpose of granting the mortgagee status as a secured creditor in a bankruptcy proceeding. (7th Cir.1959), 272 F.2d 696.

> FN3. We realize that "[t]he purpose of requiring a reasonably certain description of the debt is to preclude the parties from substituting other debts than those described, thereby making the mortgage a mere cover for the perpetration of fraud upon creditors." *Gallagher v. Central Indiana Bank, N.A.* (1983), Ind.App., 448 N.E.2d 304, 307 (*quoting New v. Sailors* (1888), 114 Ind. 407, 410, 16 N.E. 609, 610). . . .

The theme that the mortgage's description of indebtedness must be sufficient enough to prevent substitution of indebtedness not intended to be secured by the mortgage was continued in *Plummer & Co., Inc. v. National Oil & Gas, Inc.,* Ind.App., 642 N.E.2d 291, 292 (1994), *trans. denied,* 1995, as follows:

> All mortgages must be secured by a debt. *Leader Publishing Co. v. Grant Trust & Savings Co.* (1910), 174 Ind. 192, 91 N.E. 498. The mortgage need not refer specifically to the amount of the indebtedness or the notes which evidence the debt. It only requires that the debt be described. *Commercial Bank v. Rockovits* (1986), Ind. App., 499 N.E.2d 765, 767, *trans. denied* (citing IND. CODE 32–1–2–15).

The description of a debt in a mortgage does not have to be literally accurate but "must be correct so far as it goes, and full enough to direct attention to the sources of correct information in regard to it, and be such as not to mislead or deceive, as to the nature or amount of it, by the language used." *Pioneer Lumber & Supply Co. v. First–Merchants Nat'l Bank of Michigan City* (1976), 169 Ind.App. 406, 410, 349 N.E.2d 219, 222, *trans. denied* (citing *Bowen v. Ratcliff* (1895), 140 Ind. 393, 397, 39 N.E. 860, 862). A reasonably certain description of the debt is required so as to preclude the parties from substituting debts other than those described for the mere purpose of defrauding creditors. *Pioneer, supra,* 349 N.E.2d at 222 (citations omitted).

*Canaday,* 376 B.R. at 270–72.

It is also helpful at this point to review some other cases as well in which the description of the indebtedness in the mortgage was argued to be significantly deficient, but still survived a challenge under I.C. § 32–29–1–5.

> Several Indiana cases clearly establish the distinction between the description of indebtedness in the instant case and the description of an indebtedness, although defective in significant ways, which will survive challenge under I.C. 32–29–1–5. In *Pioneer Lumber & Supply Co. v. First–Merchants National Bank of Michigan City,* Ind.App., 169 Ind.App. 406, 349 N.E.2d 219 (1976), the mortgage referenced a promissory note executed by Mr. and Mrs. Arnold Bass, when in fact the obligation secured by the mortgage was executed by Richard Evans. However, the sole deficiency in the mortgage's description was the identity of the obligor of the debt; the debt

actually secured by the mortgage "was described in the mortgage in minute detail as to amount, date of execution, maturity date and payee"; 169 Ind.App. 406, 349 N.E.2d 219, 223.

\* \* \*

In *Liberty Mortgage Corp., Inc. v. National City Bank,* Ind.App., 755 N.E.2d 639 (2001), the mortgage instrument referred to a promissory note rather than to the actual evidence of the indebtedness, which was an Equity With Reserve Agreement. However, the mortgage accurately stated the date upon which the evidence of indebtedness was executed, the amount of the indebtedness, and accurately designated the mortgagee to whom the debt was owed. The Indiana Court of Appeals thus concluded, primarily because "the description of the debt in the mortgage was reasonably certain and sufficient to direct attention to the source of correct information" (755 N.E.2d 639, 643), that the description of the indebtedness in the mortgage was sufficient.

*Canaday,* 376 B.R. at 272–73.

In *Liberty Mortgage Corp.,* the mortgage described the debt it secured as "certain PROMISSORY ('NOTE(S)'), dated 10–21, 1995, in the sum of $35,000 ..., with terms of payment as therein provided, or as extended or renewed...." *Liberty Mortgage Corp., Inc.,* 755 N.E.2d at 640. The mortgage also provided that it secured the payment of any other liabilities, "when evidenced by promissory notes or other evidence of indebtedness stating that said notes or other evidence of indebtedness are secured hereby." *Id.* However, albeit the issue was not raised, the mortgage, in describing the indebtedness, did not state

when the debt matured, but was still held to be valid.

More to the point, in *Commercial Bank v. Rockovits, et al.,* 499 N.E.2d 765 (Ind. App.1987), an open ended mortgage was being challenged because it failed to contain a dollar limitation on the amount of indebtedness. There, the mortgage provided in pertinent part as follows:

This mortgage is given to the mortgagee for the securing of all indebtedness already owing by John W. Rockovits and Patricia A. Rockovits, husband and wife mortgagors to said The Commercial Bank, Crown Point, Indiana, and is also given to secure all indebtedness or liability, of every kind, character and description of the mortgagors, or either of them, to the mortgagee hereafter created, such as future loans, advances overdrafts, and all other indebtedness that may accrue to said Bank by reason of the mortgagors, or either of them, becoming surety or endorser for any other person, whether said indebtedness was originally payable to said Bank or has come to it by assignment or otherwise, and shall be binding upon the mortgagors, and shall remain in full force and effect until all said indebtedness is paid. This mortgage shall secure the full amount of said indebtedness without regard to the time when same was made.

*Commercial Bank,* 499 N.E.2d at 766.

The Indiana Court of Appeals rejected the contention that an open-ended mortgage must state a dollar limitation on the amount of debt which it secures and reasoned that the statute does not require that the mortgage refer specifically to the amount of indebtedness or the notes which evidence the debt. Rather, Indiana law only requires the debt to be described, and literal accuracy in describing the debt is not required.[9] The court further reasoned

9. *Id.* at 767.

that the mortgage directed attention to Commercial as the source of correct information regarding the debt owed to it, and that the subsequent encumbrancer challenger, Calumet National Bank, did not argue that it was in any way misled or deceived as to the nature of the debt or its amount.[10] Further, Calumet did not inform the court as to how fraud could occur where a provision such as Commercial's existed: "The provision covers all existing or future indebtedness while the mortgage is in effect. Subsequent creditors are thereby put on notice that the property may provide little or no security. Their option is to refuse to extend credit while the mortgage is in effect."[11] This case thus sustains the description of a debt by means solely of a "dragnet" clause—there was no specific description whatsoever of the obligation which gave rise to the original granting of the mortgage. There is a dragnet clause in the mortgage at issue here [subpart (b) in the first paragraph of the mortgage], and thus under a literal reading of *Commercial Bank v. Rockovits, et al.*, that provision alone is sufficient to sustain the mortgage against subsequent challenge.

I.C. 32–29–1–5 appears to provide a legislative map for the desired information concerning a debt to be stated in a mortgage, but even that statute itself contains the hedge that the description need only be "worded in substance". More importantly, the construction given to the statute by the Indiana appellate courts evidences significant latitude in allowing departure from the statutory model.

 The gist of the Indiana courts' approach to the requirement of a description of indebtedness in a mortgage is best summed up by the following statement in *Ogborn v. Eliason*, 77 Ind. 393 (1881), an approach followed consistently by subsequent cases without acknowledgment of a debt to the original case for its analysis:

> The mortgage purports to describe a note, and the description given states the amount, the date, the time of payment, the rate of interest and the name of the payee. The name of the maker or makers, it is true, is not given, but this was unnecessary, as the law does not require a full and complete description. *One that puts those who are interested upon inquiry is sufficient.* (emphasis supplied).

 In this case, the mortgage states the amount of the debt, the obligor, the obligees, the time of payment, and even the addresses of the obligees/mortgagees. Under Indiana law, the mortgage contains a description of the debt to which it relates sufficient to insulate it from attack by a subsequent "purchaser". The mortgage states:

> This Real Estate Mortgage ("Mortgage") is given on the 7 day of April, 2000, by KRAFT, LLC, to secure the debt of KRAFT FUNERAL SERVICES AND CREMATORY, INC. ("Borrower"), whose address is 370 N. County Line Road, Hobart, Indiana 46342, to [see Exhibit "A" attached for name and address of each Lender] ("Lender").

The mortgage then states, "Borrower owes Lender the aggregate principal sum of Four Hundred Thousand Dollars ($400,-000.00). This debt is evidenced by Borrower's Notes identified in Exhibit 'A' ('Note'), which provide for payment in full on or before the tenth anniversary of said notes." Notwithstanding the date of maturity issue raised by the Debtor, the description of the debt at issue is far more

10. *Id.*

11. *Id.*

detailed than in many of the cases reviewed by this court *supra,* where it was ultimately determined by the Indiana state reviewing court that the mortgage adequately described the debt under Indiana law. As the above analysis of Indiana case law demonstrates, Indiana courts do not rigidly apply any set formula when determining whether a mortgage adequately describes the indebtedness it secures. Instead, although the description of the debt does not have to be a detailed recitation of the note, it must describe the debt adequately enough to put a *bona fide* purchaser on *inquiry* notice that there is an encumbrance against the property. This mortgage passes the test.[12] The description of the debt is accurate, "as far as it goes", and additionally the mortgage provides multiple sources from which the facts surrounding this transaction can be gleaned. Besides clearly and correctly disclosing the name of the mortgagor—Kraft, LLC—and the obligor—Kraft Funeral Services and Crematory, Inc.—the attached exhibit lists the eight individuals to whom the underlying debt is owed. The facts surrounding the transaction would be further explained upon consulting one of the foregoing entities, as it is not disputed that the addresses listed in "Exhibit A" were in fact 100% correct.[13] The mortgage goes even a step further: Section Twenty of the mortgage entitled "Additional Covenants", paragraph 20.1 provides as follows, "This mortgage is subordinate to the indebtedness secured by a first [sic] Mortgage to People's Bank, S.B." Thus, Peoples Bank is another potential source of information as to the nature of the debt over which it holds a priority position.

The court concludes that under Indiana law, the description of the indebtedness in the mortgage executed by Kraft, LLC, on April 7, 2000 in favor of the Investors in the amount of $400.000.00 is correct "as far as it goes" to put a *bona fide* purchaser on inquiry notice that there exists an encumbrance against the property, and to direct that purchaser to multiple sources of definitive information about all aspects of the debt(s) which the mortgage secures, including the maturity date of the debt(s). As a result, the court finds in favor of the Investors and holds that the foregoing mortgage is not avoidable pursuant to 11 U.S.C. § 544(a)(3).

### B. *Lack of Consideration*

The next argument made by the Debtor is that the mortgage is avoidable under 11 U.S.C. § 544 due to a lack of consideration. As discussed, the underlying notes between the Investors, as payees, and Kraft Funeral Services and Crematory, Inc., as payor, were executed on September 7, 1999, while the mortgage which was intended to secure the foregoing notes was given by Kraft, LLC on April 7, 2000 to the Investors. Because the mortgage was

12. As an aside, the Notes all state that they are secured by a mortgage executed on September 8, 1999. However, the mortgage was actually executed on April 7, 2000. Obviously, it was anticipated that the mortgage was going to be executed earlier than it actually was. So, in contrast to *Canaday,* in this case it is not the mortgage which inaccurately describes the debt, but rather the notes inaccurately describe the mortgage. This fact was not addressed by the Debtor, at least in the context of the description of the debt in the mortgage; but the court finds that the result would still be the same in any event. The mortgage clearly indicates that there is a $400,000.00 encumbrance on the property, comprised of debts owed by Kraft Funeral to eight individuals whose names and addresses are delineated in an exhibit referenced in, and attached to, the mortgage. This is not a description which would be easy prey for surreptitious substitution of a debt in place of the Investors' debt.

13. *See,* Stipulation at ¶ 23.

given by an entity which did not execute any of the underlying notes, the Debtor argues that the mortgage in this case is akin to a guarantee. According to the Debtor, under Indiana law, if the guarantee is executed after the underlying obligation is incurred, there must be additional consideration given. In support of this theory the Debtor cites the cases of *Jackson v. Luellen Farms, Inc.* and *Davis v. B.C.L. Enterprises, Inc.* and argues that because no further consideration was given at the time the mortgage was executed and delivered, it is therefore avoidable.

In the case of *Jackson v. Luellen Farms, Inc.*, 877 N.E.2d 848 (Ind.Ct.App. 2007), Luellen Farms, Inc. ("LFI") was in the business of growing tomatoes, purchasing tomatoes and producing canned tomato products. For a period of thirty years it sold tomatoes to Hartford Packing Company, Inc. ("Hartford") and, more often than not, Hartford would not pay LFI on delivery, but rather would wait until after the first of the year. Once in 1997 and once in 1998, LFI had extended loans to Hartford, which were subsequently paid in full. However, by October 1, 1999 Hartford owed LFI approximately $224,656.78 for tomatoes delivered in 1998 and 1999. As a result, the president of LFI presented a $225,000.00 note to John Jackson, owner of Hartford, in order to memorialize the amount owed by Hartford to LFI. The note was signed, "Hartford Packing Company, Inc." with the signature "John K. Jackson" underneath. Several payments totaling $55,000.00 were made on the note, but a month later Hartford went out of business and was unable to pay the remaining balance. On November 12, 2004 LFI filed a lawsuit against Hartford and Jackson, alleging among other things that Jackson signed the note in his personal capacity and was therefore personally liable. As an affirmative defense, Jackson countered that the note was unenforceable

due to a lack of consideration. The trial court found in favor LFI, but Jackson appealed and argued that the note was not a negotiable instrument, that he did not sign in his individual capacity and that the note failed on the consideration issue.

The Indiana Court of Appeals agreed with Jackson, reasoning as follows:

> Consideration is a requirement for a valid contract. *Zimmerman v. McColley*, 826 N.E.2d 71, 76 (Ind.Ct.App.2005). Consideration is defined as "[s]omething of value (such as an act, a forbearance, or a return promise) received by a promisor from a promise." Black's Law Dictionary 300 (7th ed.1999). "To constitute consideration, there must be a benefit accruing to the promisor or a detriment to the promisee." *B–Dry Owners Ass'n v. B–Dry Sys., Inc.*, 636 N.E.2d 161, 163 (Ind.Ct.App.1994), *trans. denied.*

> Here, the trial court found "[t]hat the consideration for the note was the unpaid balance owed by Hartford Packing Company, Inc., to the plaintiff for the unpaid balance owing on the 1998 and 1998[sic] tomatoes delivered by the plaintiff to Hartford Packing Company, Inc." Appellant's App. at 31. Therefore, the trial court concluded that Jackson's promise to pay the antecedent debt of a third party constituted consideration adequate to support his promise to pay. We must disagree.

> The mere fact that Jackson did not receive a personal benefit under the Note is not determinative, as "[i]t is not necessary that consideration flow directly from the payee to the makers of the note in order to bind the makers, so long as they do receive some benefit under the note." *Parrish v. Terre Haute Sav. Bank*, 431 N.E.2d 132, 136 (Ind.Ct.App. 1982), *trans. denied.* In this regard,

"[t]he relief from debt on the part of a corporation can be valid consideration to uphold a promissory note signed by shareholders with a vital interest in the corporation." *Id.; see also U.S. Rubber Co. v. Moon,* 93 Ind.App. 571, 577, 179 N.E. 26, 29 (1931); *cf. In re Rolfe,* 25 B.R. 89, 93 (Bankr.Mass.1982) (noting that under Massachusetts law, "consideration exists when stockholders guarantee a corporate debt"), *aff'd,* 710 F.2d 1 (1st Cir.1983).

However, the consideration in this case was not a contemporaneous extension of benefit to Hartford, but a past extension. Past consideration can generally not support a new obligation or promise. *See Field v. Alexander & Alexander of Ind., Inc.,* 503 N.E.2d 627, 631 (Ind.Ct. App.1987), *trans. denied.* "If a person has been benefited in the past by some act or forbearance for which he incurred no legal liability and 'afterwards, whether from good feeling or interested motives, he makes a promise to the person by whose act or forbearance he has benefited, and that promise is made on no other consideration than the past benefit, it is gratuitous and cannot be enforced.'" *Brown v. Addington,* 114 Ind. App. 404, 408, 52 N.E.2d 640, 641 (1944) (quoting 17 C.J.S., Contracts, p. 470, § 116).

Here, neither Hartford nor Jackson received any benefit in exchange for Jackson's promise to pay. Unlike previous situations courts have addressed, this Note did not operate to suspend the right of LFI to enforce the debt until a future date, as the Note did not specify at what point the debt was due, and no testimony indicated that Jackson signed the Note in exchange for LFI's promise to delay collection. *See Fulton v. Laughlin,* 118 Ind. 286, 288–89, 20 N.E. 796, 797 (1889) ("holding consideration existed for note signed by corporation's officers, and recognizing that an express or implied agreement to delay the collection of a precedent debt is a sufficient consideration to support the promise of a third person"); *see also Citizen's State Bank v. Arapahoe Flour Mills,* 126 Neb. 58, 252 N.W. 475, 475 (1934) ("Extension of time on the obligation of a corporation is a sufficient consideration for the indorsement as surety of one who is president and large stockholder.").

The problem with this Note is exacerbated by the fact that Jackson had no liability on the debt when he signed the Note. In this regard, the Note is akin to a personal guaranty. In fact, Luellen's testimony indicates that he intended the Note to function as a guaranty.

Under Indiana law, "[i]t is not necessary for a guarantor to derive any benefit from the principal contract or the guarantee for consideration to exist. *If the guarantee is made at the time of the principal contract* sufficient consideration exists." *Vanek v. Ind. Nat'l Bank,* 540 N.E.2d 81, 84 (Ind.Ct.App.1989), *aff'd,* 551 N.E.2d 1134 (Ind.1990) (emphasis added). On the other hand, when a guaranty is executed subsequent to the original contract, in order for the same consideration used to support the original contract to serve as consideration for the guaranty, one of five conditions must exist:

(1) The guaranty was executed pursuant to an understanding had before and was an inducement to the execution of the principal contract; or

(2) The guaranty was delivered before any obligation or liability was incurred under the principal contract; or

(3) The guaranty was made pursuant to a contract provision; or

(4) The principal contract does not become operative until the execution of a guaranty; or

(5) The guaranty expressly refers to a previous agreement between the principal debtor and creditor which is executory in its character and embraces prospective dealings between the parties.[14]

*Merchants Nat'l Bank & Trust Co. of Indianapolis v. Lewark*, 503 N.E.2d 415, 417 (Ind.Ct.App.1987), *trans. denied* (quoting *Davis v. B.C.L. Enters., Inc.*, 406 N.E.2d 1204, 1205–06 Ind. Ct.App. 1980).

*Luellen Farms, Inc.*, 877 N.E.2d at 857–59.

The court of appeals found that none of the foregoing conditions applied. First, no evidence existed which showed that it was the understanding of the parties that when LFI extended creditor to Hartford, Jackson would personally guarantee the payment. Second, Hartford had already incurred liability to LFI at the time of the note's execution. Third, no contract provision relating to the original obligation referred to the note. Finally, the contract existed well before the note and the note made no reference to the original agreement and did not embrace prospective dealings. The court indicated that the case may have come out differently if Jackson had promised to pay Hartford's debt at the time the tomatoes were delivered, or if Jackson had signed the note in exchange for some benefit, such as a forbearance on the part of LFI in collecting against Hartford. Although Jackson had

motive to sign the note, the only party who actually benefitted was the promisee, LFI.

The first problem with the Debtor's argument here is that it is premised on the assumption that the mortgage in this case is "akin to" a guarantee, and that therefore *Luellen* applies. This is not the case. Under Indiana law, a guaranty is an independent contract to assume the liability for the payment of a debt if the primary obligor defaults in performance or payment. *McEntire v. Indiana National Bank*, 471 N.E.2d 1216, 1223 (Ind.App. 1984) (*citing, Cargill, Inc. v. Buis*, 543 F.2d 584 (7th Cir.1976)). If the obligor subsequently defaults, the guarantor becomes primarily liable on the debt, subject to the type of guarantee executed (conditional or unconditional) and to the conditions contained in the underlying agreement. *McEntire*, 471 N.E.2d at 1223. On the other hand, a mortgage is a lien which secures an underlying debt, and when that obligation is discharged the mortgage becomes *functus officio* and is legally dead. *Finucane v. Union Planters Bank, N.A.*, 732 N.E.2d 175, 177 (Ind.App.2000). These two instruments operate under different legal concepts, and flatly stating that the mortgage in this case is akin to a guarantee is like comparing the federal government's annual budget deficit to the national debt. Under Indiana law, a pre-existing debt or liability is sufficient consideration to support a mortgage given as security, and no additional consideration needs to be given at the time of making the mortgage; *Huntingburg Production Credit Association v. Griese*, 456 N.E.2d 448, 451 (Ind.App.1983).[15]

**14.** Citations omitted.

**15.** Even if the court found that *Luellen* applies, as was previously discussed, *Luellen* lists five independent exceptions in which consideration can be found to exist in the event that a guarantee is executed subsequent to the original contract. The Investors argue

that pursuant to the Stipulation and the exhibits before the court, at least two of these conditions are present in this case. One exception is that the guaranty was executed pursuant to a prior understanding between the parties and was an inducement to enter into the principal contact; another is that the

In the case of *Huntingburg Production Credit Association,* four individuals—Robert and Judith Griese along with Ferris and Mary Traylor ("Grieses and Traylors")—personally executed an open-ended promissory note to Production Credit Association which provided for current and future advances of money. Over a period of time the Grieses and Traylors accrued an outstanding balance on the note in the amount of $116,615.00. Subsequently, they received additional advances totaling $160,800.00 which were used to purchase two tracts of land. Approximately $56,700.00 was used to purchase a tract directly from Production Credit and $103,504.48 was used to purchase a tract from a third party, whom Production Credit paid directly.

Both tracts were conveyed by their respective owners directly to a corporation—the Griese–Traylor Corporation. As security for the additional advances, the Grieses and Traylors, along with the corporation, executed and recorded mortgages to Production Credit on each parcel to secure not only the $160,800.00, but the previous balance as well. Subsequently, the creditors Floyd and Mary Lemmons, were awarded a money judgment against the corporation in the amount of $35,350.50, which became a lien against the corporation's assets. Shortly thereafter, the Grieses and Traylors defaulted on the note and Production Credit filed a foreclosure action against them, the corporation and the Lemmonses (several Lemmons). The issue before the court was the priority between the mortgage of Production Credit and the judgment lien held by the Lemmons. The Lemmons argued that the mortgage was invalid because corporate assets were used to secure the debts of its officers and shareholders without specific authorization and because the corporation was not an obligor on the note. In rejecting this argument, the court ultimately found for Production Credit. In doing so, the court analyzed the sufficiency of consideration in relation to mortgages:

> A mortgage must be supported by consideration to be enforceable. *Colt v. McConnell,* (1888) 116 Ind. 249, 19 N.E. 106; 59 C.J.S. *Mortgages,* Sec. 87 (1949). Any consideration which will sustain a promise to pay will suffice. *Bretz v. Moenkhaus,* (1930) 90 Ind.App. 603, 169 N.E. 472. It is not necessary that the obligee actually give anything of value to the obligor, and sufficient consideration

---

guaranty was made pursuant to a contractual provision. Unfortunately, the Investors do not cite the specific portions of the record which may ultimately support their contentions. However, based upon the facts surrounding this transaction as set out by the court, *infra,* the Investors' contentions have merit.

It is clear to the court that the mortgage was executed pursuant to a prior agreement among the parties, and viewing the entire transaction as a whole (as the parties obviously intended it to be), that the provision of collateral security for the Investors was a necessary, contemplated and bargained for element of their lending of money to Kraft. In this case the "guarantee", which would be the mortgage Kraft, LLC gave to the Investors, arose from a contractual provision. The

Subscription Agreement dated September 7, 1999, entered into the record as exhibit # 5, specifically provides that the debt to the Investors is to be secured by, "a mortgage on the real estate to be developed." This provision and the record as a whole also establish that the mortgage was an inducement to the "execution of the principal contract", i.e., the agreement of the Investors to loan money. Actually, in a very real sense, although the mortgage was executed and delivered after the loan transaction was effected, it was required as part of the loan transaction, and thus was provided for present, not past, consideration. Therefore, if the court were to find that the mortgage was a type of guarantee, the Debtor would not prevail on the argument that it is unsupported by consideration.

will be found if it is shown that the mortgagee suffered any damage, inconvenience, detriment or loss, or that he extended any forbearance in reliance upon the mortgage. Consideration exists if it is shown that any right, profit, benefit accrued to the mortgagor, or that responsibility was suffered or undertaken by another. *Bretz, supra; Salt Springs National Bank v. Schlosser,* (1930) 91 Ind.App. 295, 171 N.E. 202; and 59 C.J.S. *Mortgages* Sec. 89. A pre-existing debt or liability is sufficient consideration to support a mortgage given as security, and there need not be a new consideration at the time of making the mortgage. This last point affects the status of the mortgagee as a bona fide purchaser which we will discuss below. *Sodders v. Jackson,* (1942) 112 Ind.App. 179, 44 N.E.2d 310; 59 C.J.S. *Mortgages* Sec. 91. The conveyance of land constitutes consideration. *The Fort Wayne Electric Light Company v. Miller,* (1892) 131 Ind. 499, 30 N.E. 23.

*Adequacy of Consideration:*

Where the thing agreed upon as the consideration has no determined value, the judgment of the parties as to its sufficiency will not be disturbed by the court; and where a party without fraud or deception enters into a contract for consideration and receives all he contracts for, he cannot be relieved on the ground of want of consideration. *Colt, supra, Cook v. American States Insurance Company,* (1971) 150 Ind.App. 88, 275 N.E.2d 832; *Wilson v. Dexter,* (1963) 135 Ind.App. 247, 192 N.E.2d 469; *Cates v. Seagraves,* (1914) 56 Ind.App. 486, 105 N.E. 594.

*Consideration Flowing from and to a Third Party:*

It is not necessary that the consideration to support a mortgage flow directly from the mortgagee to the mortgagor, and a benefit may accrue to, or the detriment may be suffered by a third party. *Moehlenkamp v. Shatz,* (1979) Ind.App., 396 N.E.2d 433; *Pierce v. Gas City Lumber Co.,* (1937) 104 Ind.App. 234, 7 N.E.2d 511; 59 C.J.S. *Mortgages,* Sec. 88. A mortgage may secure the debt of another without the necessity of the mortgagor assuming the personal liability of the debt. *Gallagher v. Central Indiana Bank,* (1983) Ind.App., 448 N.E.2d 304. When writings are executed at substantially the same time, and relate to the same subject matters, they must be construed together, and the consideration for one instrument may be found in the contemporaneous instrument. *Torres v. Meyer Paving Company,* (1981) Ind.App., 423 N.E.2d 692.

*Bona Fide Purchaser:*

In order to entitle a mortgagee to the status of a bona fide purchaser his mortgage must be supported by valid contemporaneous consideration. 59 C.J.S. *Mortgages,* Sec. 240. A mortgage supported by a pre-existing debt does not constitute the mortgagee a bona fide purchaser as is necessary to cut off *existing* equities. *Sodders v. Jackson, supra.* However, a note and mortgage as additional security for a pre-existing debt *and* additional advances of money are valuable consideration which will constitute the mortgagee a bona fide purchaser. *State Bank of Downs v. Criswell,* (1942) 155 Kan. 314, 124 P.2d 500; 59 C.J.S. *Mortgages,* Sec. 241 and 91; *Glenn on Mortgages,* Vol. 3, Sec. 383 (1943). The basis of the rule is that the mortgagee has irrevocably changed position, always important in the determination of the status of whether a mortgagee is a bona fide purchaser.

*Huntingburg Production Credit Association,* 456 N.E.2d at 451–52.

In this case there is no question that the mortgage was executed after Kraft Funeral entered into the Notes with the investors. It is also true that at the time the mortgage was executed, the Investors provided no other accommodation, i.e. they did not contemporaneously advance any more money. However, the issue in *Huntington Production Credit Association was whether the mortgagee was a bona fide purchaser solely for the purpose of cutting off* **existing** *equities*—this is not what Kraft, LLC is attempting and is not a factor in the case before the court.

The court finds that there is indeed sufficient consideration to support the subject mortgage. As discussed, under Indiana law a pre-existing debt is sufficient consideration to support a mortgage given as security. Moreover, it is not necessary that consideration to support the mortgage flow directly from the mortgagor to the mortgagee—a benefit can accrue to, or a detriment may be suffered by, a third party.

When negotiations first ensued between the Investors and Kraft Funeral, it was the understanding of the parties that the indebtedness owed to the Investors would eventually be secured by a mortgage on the Property; as evidenced from a draft subscription agreement and draft second mortgage submitted to the court.[16] In a fully executed subscription agreement, dated September 7, 1999, the parties explicitly agreed that the indebtedness would be secured by a mortgage, and on April 7, 2000, the Investors were in fact given a mortgage.[17] So, in exchange for the Investors making the loans (the detriment), they subsequently received the benefit of a mortgage lien on the Property.

But a benefit also inured to Kraft Funeral (a third party with respect to the mortgage) as a result of this transaction. The Investors executed the Notes on September 7, 1999, with a total of $400,000.00 paid to Kraft Funeral that same day.[18] In the Stipulation submitted to the court, the parties stated as follows:

> On, or about September 7, 1999, each of the Investors paid to Kraft Funeral $50,000; a total of $400,000.00 was paid to Kraft Funeral. The funds received from Investors were partially used in the construction of the funeral home building.[19]

Obviously, the benefit to Kraft Funeral was that the construction project was able to progress, at least in part, due to the cash it received from the Investors. Kraft Funeral then eventually quit-claimed the Property to Kraft, LLC on January 7, 2000 and the construction of the funeral home was completed on March 15, 2000. In light of these circumstances, the court concludes that there is sufficient consideration in support of the subject mortgage under Indiana law.[20]

Moreover, Kraft, LLC was also a direct beneficiary of these transactions. During the time during which the Investors and Kraft Funeral were negotiating, it became quite apparent that a limited liability company would at some point be formed as a part of the overall transaction. In the late part of 1998, the Investors and Kraft Funeral began discussing the possible construction of a funeral home and cremato-

---

16. *See,* Exhibit # 1 and Exhibit # 2.

17. *See,* Exhibit # 5.

18. *See,* Stipulation at ¶ 11 & 12.

19. *See,* Stipulation at ¶ 12.

20. Kraft Funeral also received other consideration which will be discussed *infra.*

ry.[21] These discussions were ongoing through July of 1999. Indeed, prior to the formation of the limited liability company, the parties went so far as to draft a subscription agreement and a second mortgage, even though these documents were never fully executed. Initially, Kraft Funeral had approached National City for financing, but was declined. Subsequently, Kraft Funeral approached Peoples Bank who approved financing for the project and on July 8, 1999, proceeded to issue a written loan commitment.[22] The commitment stated that the borrower of these funds was to be a limited liability company—which had not yet been formed. It also required the subordination of the Investor's interest to the bank and a $340,000.00 equity cushion to be deposited in escrow and applied towards construction prior to any disbursement by the bank.[23]

The commitment also set out two loan options: a) a loan for a maximum aggregate of $800,000.00, consisting of three credit facilities—a loan for construction costs, an end loan, or money for equipment; or b) a loan for the lower of $800,000.00, 100% of the hard costs or 85% of the appraised value of the project and associated equipment. In either case, the amount of money the yet to be formed limited liability company (Kraft, LLC), could receive was capped at $800,000.00. On April 7, 2000 Kraft, LLC executed two notes in favor of Peoples Bank, one in the amount of $69,000.00 and the other in the amount of $731,000.00. On that same day, Kraft Funeral gave a mortgage on the Property to Peoples Bank in the amount of $800,000.00.[24] The total cost for the purchase of the Property, the construction of

the new funeral home building and any other improvements and equipment was estimated to be $1.2 million.[25] Obviously, the two loans from Peoples Bank were not sufficient to cover all of these costs and there was a $400,000.00 shortfall. It is not coincidental that this is the same amount the Investors lent to Kraft Funeral. Clearly, without the loans from the Investors to Kraft Funeral, the project would have been underfunded. Furthermore, Peoples Bank potentially may not have committed to financing the project, due to the fact that $340,000.00 had to be deposited in escrow and applied towards construction prior to any disbursement by the bank. As discussed, on January 4, 2000, Kraft Funeral quit-claimed the property to Kraft, LLC. The project was competed on March 15, 2000, and on April 7, 2000 Kraft LLC executed the notes and mortgage with Peoples Bank. Since that time, Kraft LLC has been leasing the subject real estate to Kraft Funeral. But for the $400,000.00 loans from the Investors, Kraft, LLC would not have found itself in the position of an owner and landlord of a funeral home.

Finally, as a precondition of the loan it gave to Kraft, LLC, Peoples Bank required that the Investors agree to subordinate its mortgage interest in the Property in favor of the bank's lien interest.[26] On September 7, 1999, at the same time Kraft Funeral executed the Notes to the Investors and prior to Kraft LLC's execution of the promissory notes and mortgage in favor of Peoples Bank, the Investors and Kraft Funeral signed and executed a subscription agreement for each note, where-

---

21. *See,* Stipulation at ¶ 2.

22. *See,* Exhibit # 3 attached to the Stipulation.

23. *See,* Stipulation at ¶ 7.

24. *See,* Stipulation at ¶ 18 and Exhibit # 10.

25. *See,* Stipulation at ¶ 9.

26. *See,* Stipulation at ¶ 15 and Exhibit # 8.

by the Investors agreed that their mortgage on the real estate to be developed would be subservient to the liens of Peoples bank and to that of Northwest Regional Development Company.[27]

Then, at the request of Peoples Bank on December 23, 1999 (again is prior to the bank moving forward with the $800,000.00 loan to the Debtor), the Investors and Kraft, LLC executed an inter-creditor agreement wherein all the Investors agreed to completely subordinate the sum total of their indebtedness—in the amount of $400,000.00—to that of the bank. So, notwithstanding the fact that the Investors received a mortgage on the Property, they subordinated their debt in favor of the bank so that financing could be secured for the project. This financing obviously accrued to the benefit of *both* Kraft, LLC, and Kraft Funeral. As a result, without question, the Investors were not the sole beneficiaries of the mortgage given by Kraft, LLC. The Investors got the benefit of a lien on the Property. In exchange, they had to subordinate their lien rights to that of the bank so that Kraft, LLC could obtain financing for the project.

Based upon the foregoing the court finds that sufficient consideration exists to support the mortgage.

### C. *The Standing of the Debtor*

As a final note, and as an affirmative defense, the Investors argue that the Debtor lacks the requisite standing to even bring an avoidance action due to the fact that if the subject mortgage is avoided, there would be no benefit to the estate under 11 U.S.C. § 550. Given the court's ruling in favor of the Investors in this case, this argument is essentially moot. Nevertheless, the Investors argue:

The Debtor's Amended Plan (docket # 108) does not specifically state that [sic] "former owners/equity holder" retain their ownership. By necessary, undeniable implication the former equity owners are the beneficiaries, who will reap the benefits of the present avoidance action, if successful. No creditor of the Debtor (i.e. pre bankruptcy creditors) receive, or possibly will receive an equity stake in the reorganized Debtor.[28]

According to the Investors, pursuant to the Debtor's amended disclosure statement, assuming the avoidance action is successful, the only creditors who would be paid out of the proceeds of the avoidance action would be: Peoples Bank, the Lake County Treasurer and a single unsecured creditor (added as a result of the Debtor amending Schedule F). The Investors also point out that upon examination of the liquidation analysis provided with the amended disclosure, after distribution to all creditors, the former equity holders and/or Kraft Funeral would receive a "windfall" of approximately $552,322.48.

As courts have noted, the issue of whether the estate will benefit is an issue that must be decided pursuant to 11 U.S.C. § 550—and is a separate action unto itself.

Section 550(a) is a secondary cause of action after a trustee has prevailed pursuant to the avoidance sections of the Bankruptcy Code. *Santee v. Nw. Nat'l Bank (In re Mako, Inc.)*, 127 B.R. 471, 473 (Bankr.E.D.Okla.1991). "Section 550(a) stands as a recovery statute only and not as a primary avoidance basis for an action, as it will only survive when coupled with the transfer avoidance sections of the Code." *Id.* Even though an

---

27. *See,* Stipulation at ¶ 10 and Exhibit # 5.

28. *See,* Defendant Investor's Memorandum of Law at pg. 2.

action to avoid a transfer may be, and often is, brought in conjunction with an action to recover the property transferred or its value, a court must evaluate the two bases of relief separately. *SKK Liquidation Trust v. Green & Green, LPA (In re Spinnaker Indus., Inc.)*, 328 B.R. 755, 764 (Bankr.S.D.Ohio 2005); *Barber v. McCord Auto Supply, Inc. (In re Pearson Indus., Inc.)*, 178 B.R. 753, 759 (Bankr.C.D.Ill.1995).

Section 550(a) effectively limits actions to only those that benefit the estate. *P.A. Bergner & Co. v. Bank One, Milwaukee, N.A. (In re P.A. Bergner & Co.)*, 140 F.3d 1111, 1118 (7th Cir.1998); *Kmart Corp. v. Intercraft Co. (In re Kmart Corp.)*, 310 B.R. 107, 126 (Bankr. N.D.Ill.2004). Section 550 allows the trustee to recover the entire value of the property transferred, even if it exceeds the debt to the creditor that provided the basis for the action. *Kleven v. Stewart (In re Myers)*, 320 B.R. 667, 670 (Bankr.N.D.Ind.2005). "Once the whole transfer has been pulled into the estate, the money is distributed according to the priorities established by the Code and the debtor's own commitments." *FBN Food Servs.*, 82 F.3d at 1396.

*Grochocinski v. Scilossberg, et al. (In re Eckert)*, 388 B.R. 813, 836–37 (Bankr. N.D.Ill.2008).

 The Seventh Circuit Court of Appeals has addressed this concept in the context of a preference action and has held that the Bankruptcy Code does not permit the avoidance of a preferential transfer unless the recovery would be for the benefit of the estate; *P.A. Bergner & Co. v. Bank One, N.A.*, 140 F.3d 1111,1118 (7th Cir.1998). The court also acknowledged that benefit to the creditors of the estate, rather than to the debtor alone, is necessary for recovery under § 550(a); *Id.* [citing, See *Harstad v. First American Bank*,

39 F.3d 898, 905 (8th Cir.1994); 5 Lawrence P. King, *Collier on Bankruptcy* P 550.02[2] (1997)]. Moreover, it is not required that a benefit resulting from an avoidance action only benefit the unsecured creditors: it can accrue to the exclusive benefit of the secured creditors of the estate as well; *Mellon Bank, N.A. v. GE Supply Company, et al.*, 351 F.3d 290, 293 (7th Cir.2003) ["Lest this way of resolving the issue be taken to assume that § 550(a) requires that some benefit flow to unsecured creditors, we add that the statute does not say this. Section 550(a) speaks of benefit to *the estate*—which in bankruptcy parlance denotes the set of all potentially interested parties—rather than to any particular class of creditors."].

The court in the case of *Barber v. McCord Auto Supply, Inc. (In re Pearson Industries, Inc.)*, 178 B.R. 753, 758 (Bankr. C.D. IL 1995), stated as follows:

> We have not faced this § 548/550 standing issue before, nor has it received great attention from other appellate courts. Courts considering the issue, however, have, with unanimity, concluded that a trustee or a debtor-in-possession of a bankruptcy estate cannot maintain an avoidance action under § 548 unless the estate would be benefitted by the recovery of the transferred property. In *Whiteford Plastics Co. v. Chase Nat'l Bank*, 179 F.2d 582 (2d Cir.1950), the Second Circuit Court of Appeals refused to recognize the power of the Chapter 11 debtor to void a defective recorded lien under § 70(c) of the former Bankruptcy Act, 11 U.S.C. § 110(c), because voiding the lien would benefit only the debtor, not the unsecured creditors who had previously accepted the arrangement and could receive no more than the ten percent of their claims which had been provided. To this same general effect is *In re Vintero Corp.*, 735 F.2d 740, 742 (2d Cir.1984); *In re*

*Schwab,* 613 F.2d 1279, 1281 n. 2 (5th Cir.1980); and *City Nat'l Bank & Trust Co. v. Oliver,* 230 F.2d 686, 690 (10th Cir.1956).

In our view, "this conclusion in this case is mandated by the language of § 550(a) that the trustee may recover, *for the benefit of the estate,* the property transferred." (Emphasis added.) In support of this principle, Collier on Bankruptcy states:

The preamble to section 550(a) limits the trustee by permitting recovery only for the benefit of the estate. Thus, in general, the trustee or debtor in possession may not recover the property transferred or its value when the result is to benefit only the debtor rather than the estate.

4 Collier on Bankruptcy, P550.02 n. 3 (15th ed.1979).

However, should the foregoing decisions be interpreted to mean that a debtor can never benefit from an avoidance action if, after distribution, there is a surplus? Under that line of logic, a debtor would never have standing to bring an avoidance action unless *all* benefit accrued solely to the estate. In the case before the court, clearly the Debtor is contemplating a distribution being made to both secured and unsecured creditors. However, according to the Investors, the principal beneficiary of the avoidance action is the Debtor, and consequentially, the Debtor does not have standing to maintain the action. Although there is a benefit to the estate, the Investors seem to argue the benefit to the estate is negligible in comparison to that obtained by the Debtor and therefore the Debtor does not have standing to proceed.

Many of the decisions concerning this issue do not differentiate between the degree to which a debtor may potentially benefit from an avoidance action as compared to the degree to which the estate may potentially benefit. The majority of the decisions in this regard only require that the estate benefit—which in this case it clearly does. Additionally, 11 U.S.C. § 551 specifically requires that a transfer avoided pursuant to § 544 be preserved for the benefit of the estate. If the Debtor were successful, the equity position thus obtained would be preserved for the benefit of the estate. There is an issue lurking here as to the *extent* to which the mortgage could be avoided for the benefit of the estate, as contrasted to the benefit of the Debtor's shareholders as equity interests in the Debtor. It is not necessary to battle over this issue; the Debtor has already lost the war.

Based upon the foregoing the court concludes, for what it is worth, that the Debtor has standing to bring this action.

## III. *DETERMINATION*

IT IS ORDERED, ADJUDGED AND DECREED that the mortgage dated April 7, 2000, between the Debtor, Kraft, LLC, and the Defendant Investors is not avoidable pursuant to 11 U.S.C. § 544(a)(3), or otherwise.